IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**ISRAEL RODRÍGUEZ-GONZÁLEZ**,
    Petitioner,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 19-1643 (BJM)

**OPINION AND ORDER**

    Israel Rodríguez-González ("Rodríguez") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Rodríguez contends that the administrative law judge ("ALJ") improperly weighed opinion evidence in assessing his residual functional capacity ("RFC") and made various errors at step five of the evaluation process. Docket No. ("Dkt.") 13. The Commissioner opposed. Dkt. 19. This case is before me by consent of the parties. Dkt. 7. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

**STANDARD OF REVIEW**

    After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.

Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through

which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

Rodríguez was born on April 5, 1979. Tr. 46. At age four, he developed Type 1 diabetes. Tr. 136. He completed the 11th grade, Tr. 50, and worked various jobs, including those in maintenance, construction, and grocery stocking and bagging. Tr. 269. Over time, he developed complications related to diabetes in addition to other ailments, including hypertension, back pain, and Type 2 diabetes. Tr. 199. In late 2014, Rodríguez developed worsening pain in his legs related to diabetic neuropathy. Tr. 55. His doctor recommended that he not work for a year, and he was terminated from his job. Tr. 55-56.

On June 1, 2015, Rodríguez applied for disability benefits, claiming an onset date of January 1, 2014. Tr. 417-21. The Commissioner denied Rodríguez's claim initially, on

reconsideration, and after a hearing before an ALJ. Tr. 28. The record before the Commissioner, which included medical evidence and Rodríguez's self-reports, is summarized below.

Dr. Jose Román Carlo ("Dr. Román") treated Rodríguez for diabetes and hypertension, seeing Rodríguez regularly from December 2014 through December 2017. On December 21, 2014, Dr. Román certified that Rodríguez suffered from right foot cellulitis, and, because of that condition, he would be unable to work from December 21, 2014 through January 30, 2015. Tr. 146.

Rodríguez was admitted to Hospital Bella Vista on December 22, 2014, arriving with an infection in the right foot. Tr. 562. An x-ray showed no fracture or dislocation, Tr. 563, and other right leg imaging found no evidence of hemodynamically significant arterial stenosis or deep venous thrombosis. Tr. 564-65. Hospital notes are largely illegible, but they show that Rodríguez was diagnosed with diabetic neuropathy and right foot toe cellulitis and discharged to home on December 27 with a guarded prognosis. Tr. 560, 562, 640.

Rodríguez continued treatment for diabetes with Dr. Román. Between December 2014 and February 2015, Dr. Román saw Rodríguez seven times for swelling and redness on the right foot and abnormalities on the first toe. Tr. 211, 594-98. On January 9, 2015, right toe imaging showed focal soft tissue swelling and an otherwise negative examination. Tr. 575-77. By February 9, the toe was completely healed; however, swelling in the foot remained, and Rodríguez's pain score remained a four out of ten. Tr. 599. Results of an electrodiagnostic examination taken in March were compatible with a severe sensory motor polyneuropathy. Tr. 147.

At several appointments through the end of 2015, Dr. Román noted the presence of lesions on Rodríguez's skin. Tr. 600-04, 624. He also recorded swelling at various other visits, Tr. 203, 602, 624, and reported pain scores ranging from zero to eight over the course of treatment. *See* Tr. 137, 200, 203-05, 207, 211, 594-601, 624. Records show that seven of Rodríguez's appointments with Dr. Román were for the purposes of obtaining a prescription. Tr. 201-02, 206, 208-10, 603. Prescriptions included those for Bactrim, Cleocin, Doxycycline, Hyclate, Gabapentin, Humulin, Hyzaar, Lipitor, Minocycline, Mobic, Neurontin, Norflex, and Ultracet. Tr. 137, 140-41, 200-210.

On December 29, 2017, Dr. Román found multiple abscesses on different areas of Rodríguez's upper body, trunk, and lower extremities. Tr. 755. The same day, Dr. Román wrote a letter certifying that Rodríguez suffered from cutaneous abscess; essential hypertension; Type 2 diabetes mellitus with proliferative diabetic retinopathy without macular edema, bilateral; Type 1 diabetes mellitus with diabetic neuropathy; Type 1 diabetes mellitus with unspecified diabetic retinopathy without macular edema; and low back pain. Tr. 199. In light of these conditions, Dr. Román stated that Rodríguez was "unfit to work." Tr. 199.

Rodríguez's vision also suffered due to his diabetes. He sought treatment with retina specialist and ophthalmologist, Dr. Andres Emanuelli Anzalotta ("Dr. Emanuelli"), who performed laser surgery twice in both eyes. Tr. 157, 260, 679. On February 26, 2016, Rodríguez visited Dr. Valeriano Alicea Cruz ("Dr. Cruz") for a consultative ophthalmological evaluation. Tr. 673-74. Dr. Cruz diagnosed Rodríguez with diabetes mellitus, advanced proliferative diabetic retinopathy, vitreous hemorrhage, tractional retinal detachment, and diabetic neuropathy. Tr. 674. Ultimately, Rodríguez lost his vision in one eye. Tr. 679.

Rodríguez also occasionally sought treatment for diabetes with Dr. Franklin Plúguez Feliciano, who reported that Rodríguez suffered from peripheral neuropathy and leg pain. Tr. 118, 124-25. And he twice visited the emergency room for hypoglycemia—once in January 2014 and again in November 2015—where doctors noted that he was weak, pale, cold, and sweaty. Tr. 114, 151. Treatment included medications and fluid. Tr. 115.

Doctors and nurses at the State Insurance Fund ("SIF") treated Rodríguez for persistent lumbosacral pain from 2015-2017. Rodríguez typically described his pain as moderate, *see, e.g.*, Tr. 177, 221, 232, 235-36, 238, 242, 245, and at least once described it as intense, Tr. 230. Usually, Rodríguez arrived to appointments walking without difficulty, Tr. 163, 175, 220, 222, 225, 228, 233, 235, 237, 239, 243, 251-52, 258, although he was sometimes walking with difficulty, Tr. 161, 230, 241, and at least one time used a cane, Tr. 230. SIF personnel reported that Rodríguez had a limited range of motion in the lumbar region, Tr. 222, 235, 239, 251, and they prescribed various

medications, including Cataflam, Lodine, Neurin, Neurontin, Norflex, and Relafen, Tr. 177, 212, 221, 227-30, 234, 240, 242.

On November 12, 2015, spinal imaging showed lumbar muscle spasm with early spondylosis; narrow disc spaces with osteoarthritic changes; loss of expected lordosis; mild retrolisthesis at L5-S1; narrow neural foramina at L4-L5 and L5-S1; and early bilateral sacroiliitis. Tr. 162. Imaging of the lumbosacral spine dated February 2, 2016 showed degenerative changes and disc disease, including mild right neural foraminal narrowing secondary to facet hypertrophy at L3-L4; a circumferential disc bulge and moderate bilateral neural foraminal narrowing at L4-L5; a central disc protrusion with neural foraminal narrowing at L5-S1; and facet hypertrophy throughout the spine. Tr. 173, 250.

Rodríguez was referred to a physiatrist, Tr. 161, and he completed multiple rounds of physical therapy. Tr. 174, 212, 220, 259, 251. Physical therapy records show that Rodríguez suffered from muscle spasms, limited movement, and lumbar pain, including pain on flexion. Tr. 215, 217-18, 252, 254. However, his sensation was unaffected and muscle tone normal. Tr. 215, 217-18, 252, 254. Edema, atrophy, contracture, and deformities were absent. Tr. 215, 217-18, 252-55. He could walk without difficulty, and his gait pattern was normal. Tr. 215, 217-18, 252. According to notes dated January 14, 2016, Rodríguez's balance while seated, standing, and walking was good, and he could tolerate sitting, standing, and walking for 11-30 minutes. Tr. 255.

On December 7, 2016, Rodríguez visited a neurosurgeon to be evaluated for surgery, but the neurosurgeon did not recommend surgery. Tr. 720. On January 24, 2017, SIF personnel recommended exercise, prescribing thirty minutes per day of walking without stopping and without self-harm. Tr. 223.

On March 8, 2016, Rodríguez visited Dr. Winston Ortiz ("Dr. Winston Ortiz") for a consultative examination. Tr. 679. Dr. Winston Ortiz took Rodríguez's medical history, noting that laboratory results had shown severe sensory motor polyneuropathy and disc herniation at L5-S1, and reporting that Rodríguez suffered from low back pain radiating down both legs, hypertension, diabetes mellitus, diabetic neuropathy, and diabetic retinopathy. Tr. 679. Dr. Winston Ortiz tested

Rodríguez's visual field, finding normal results on the right side, but noting that he could not test the left, as Rodríguez had completely lost his vision in one eye. Tr. 679. He also found retinopathy with macular edema bilaterally. Tr. 679. In evaluating Rodríguez's motor system, Dr. Winston Ortiz identified no weakness, atrophy, involuntary movements, lack of coordination, or loss of tone. Tr. 680. There were no trophic changes, swelling, deformities, or contractures, and Rodríguez could perform fine motor tasks. Tr. 680. Rodríguez's muscle stretch reflexes were normoactive and symmetrical, except for diminished ankle and knee jerks bilaterally. Tr. 680. In evaluating Rodríguez's sensory system, Dr. Winston Ortiz encountered stocking and glove hypalgesia bilaterally. Tr. 680. Rodríguez had limited range of motion in his back and moderately severe lumbar paravertebral muscle spasm, but there was no loss of lumbar lordosis. Tr. 680. Rodríguez could bend, stoop, kneel, and squat. Tr. 680. Although Rodríguez could walk on his heels and toes, he walked with an antalgic gait. Tr. 679. The impression was lumbar disc herniations at L5-S1, essential hypertension, diabetes mellitus, diabetic sensorimotor polyneuropathy, diabetic retinopathy, and blindness secondary to vitreous hemorrhage. Tr. 680. Dr. Winston Ortiz opined that Rodríguez could not perform jobs requiring heavy lifting and carrying, walking long distances, standing and sitting for prolonged periods, and bending frequently. Further, he could not perform jobs requiring binocular vision. Tr. 680.

Non-examining state agency medical consultants reviewed the record and opined as to Rodríguez's limitations. On October 28, 2015, Dr. Osvaldo Rivera ("Dr. Rivera") concluded that Rodríguez could perform medium work. Tr. 268. Dr. Rivera concluded that Rodríguez could lift fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit for six hours during an eight-hour workday; and push, pull, and balance on an unlimited basis. Tr. 267-68. He could also frequently climb, stoop, kneel, crouch, and crawl. *Id.* On March 17, 2016, Dr. Cristina Ortiz ("Dr. Cristina Ortiz") determined that Rodríguez could perform light work without handling, standing, or walking limitations, but only in environments appropriate for monocular vision. Tr. 287. She determined that Rodríguez could occasionally lift twenty pounds and frequently lift ten pounds. Tr. 285. He could stand, walk, and sit for six hours in an eight-hour workday, and his

balancing, pushing, and pulling were unlimited. Tr. 285-86. He could frequently climb, stoop, kneel, crouch, and crawl. *Id.* His visual field on the left was limited, and he thus lacked the ability to avoid hazards in the workplace. Tr. 286.

On January 22, 2018, Rodríguez appeared for a hearing before an ALJ. Tr. 43. He testified that he had completed the 11th grade, could not communicate in English, and previously worked in a grocery store stocking shelves and bagging groceries. Tr. 50-51. While he was working at the grocery store, he began losing his vision, and his diabetic neuropathy worsened, causing him leg pain. Tr. 55, 62. He stopped working when his doctor decided that, because the neuropathy had worsened his condition, he should not work for a year. Tr. 55. Rodríguez also testified that he had internal bleeding in both eyes, and he had undergone eye surgery, eye injections, and various laser therapies. Tr. 58, 62. He had lost his vision in one eye, and he used glasses to see with the other eye. Tr. 58, 62. He also suffered from back pain at the bottom of his spine as well as leg neuropathy in both legs. Tr. 57, 63. Among his medications was Neurontin, which caused memory lapses, memory loss, dizziness, and drowsiness. Tr. 64. Dr. Román had recommended that Rodríguez use a cane to help with balance from dizziness, and Rodríguez used a cane to walk and to get up carefully, though he did not bring it to the hearing. Tr. 63-64. Rodríguez also stated that he could stand or walk continuously for approximately thirty minutes, but after that time, his legs would go numb and he would feel a stabbing, burning pain at the bottom of his feet. Tr. 57. He could sit continuously for approximately fifteen to seventeen minutes but would then develop lower back pain. Tr. 57. He did not drive due to pain, but he could walk about four minutes to run an errand at a nearby store. Tr. 48-49. To travel farther, he would take a taxi or someone else would drive him. Tr. 49. A vocational expert ("VE") also testified. Tr. 65-70.

The ALJ announced her decision on February 26, 2018. Tr. 28-37. She determined that Rodríguez had not engaged in substantial gainful activity since January 1, 2014, his alleged onset date, and that his date last insured was June 30, 2019. Tr. 30. She found that Rodríguez had the following severe impairments: lumbar disc herniation at the L5-Sl level; hypertension; diabetes; diabetic sensorimotor polyneuropathy; diabetic retinopathy; and blindness OS second to vitreous

hemorrhage. Tr. 30. At step three, the ALJ considered Listings 1.04 (disorders of the spine), 2.01 (impairments pertaining to special senses, including vision), and 11.14 (peripheral neuropathy), but determined that, based on the opinions of state agency medical consultants, Rodríguez's impairments neither met nor equaled these listings. Tr. 31. Next, the ALJ made the following RFC determination: Rodríguez could perform light work,[1] except that he could only stand or walk for four hours in an eight-hour workday while having the option to sit or stand at will without loss of production. Tr. 31. Further, Rodríguez could frequently climb, stoop, kneel, crouch, and crawl, and, because he did not retain the visual field to avoid hazards in the workplace, he should avoid all exposure to hazards such as machinery, unprotected heights, and moving mechanical parts. Tr. 31. In reaching this conclusion, the ALJ afforded great weight to the opinion of consultative examiner Dr. Winston Ortiz to the extent it was consistent with the other evidence on file, which, according to the ALJ, indicated moderate musculoskeletal and neurological conditions. Tr. 33. She offered little weight to treating physician Dr. Román's statement that Rodríguez was unable to work, finding this statement inconsistent with the conditions for which Dr. Román treated Rodríguez and Dr. Román's treatment notes, which did not establish such limitation. Tr. 33. The ALJ gave partial weight to the opinion of consulting ophthalmologist, Dr. Cruz, as her opinion failed to establish any limitations, but the remaining evidence showed that Rodríguez was limited with monocular vision. Tr. 33. She gave little weight to state agency consultant Dr. Rivera, finding a limitation to medium work inconsistent with the objective evidence on file, which supported greater restriction. Tr. 34. And she awarded partial weight to the opinion of state agency consultant Dr. Cristina Ortiz, adopting her lifting, carrying, and visual restrictions but finding that Rodríguez had greater limitations in the areas of walking and standing than Dr. Cristina Ortiz believed. Tr.

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Individuals capable of performing light work can also perform sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

34. She credited the type of symptoms Rodríguez alleged but not their severity, finding his testimony inconsistent with other record evidence. Tr. 35.

Next, the ALJ found that Rodríguez could not perform his past work. Tr. 35. However, based on VE testimony and Medical-Vocational Rule 202.18, set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2, he could perform other work existing in significant numbers in the national economy. Tr. 35-37. Accordingly, the ALJ found that Rodríguez was not disabled under the Act.

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Rodríguez raises the following two arguments: (1) the ALJ's RFC determination is not supported by substantial evidence because she wrongly evaluated the evidence from Dr. Román and (2) the ALJ's step-five determination is based on an inaccurate view of Rodríguez's limitations and education level.[2] The Commissioner maintains that substantial evidence supports the ALJ's decision. I will address each argument in turn.

RFC is the most a claimant can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* When measuring a claimant's capabilities, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Rodríguez v. Sec'y of Health & Human Servs.*, 944 F.2d at 7 (1st Cir. 1991). The reason for requiring an expert's RFC assessment is that generally, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso–Pizarro*, 76 F.3d at 17 (per curiam); *see also*

---

[2] Rodríguez also suggests that the ALJ wrongly discarded Listings 1.04, 2.01, and 11.14, Dkt. 13 at 10, but he makes no attempt to develop this argument. Accordingly, Rodríguez's step-three argument is waived. *See Redondo-Borges v. U.S. Dept. of Hous. and Urb. Dev.*, 421 F.3d 1, 6 (1st Cir. 2005) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)) ("Few principles are more sacrosanct in this circuit than the principle that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'").

*Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record."). "This principle does not mean, however, that the [Commissioner] is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [Commissioner] does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils*, 921 F.2d at 329.

Here, the ALJ determined that Rodríguez could perform light work with certain exceptions. He could only stand or walk for four hours in an eight-hour workday while having the option to sit or stand at will without loss of production, and he could frequently climb, stoop, kneel, crouch, and crawl. Tr. 31. Further, he should avoid all exposure to hazards such as machinery, unprotected heights, and moving mechanical parts, as he lacked the visual field to avoid hazards. Tr. 31. Indeed, Rodríguez would be restricted to jobs that could be performed with monocular vision. Tr. 33. This determination is supported by the opinions of Dr. Winston Ortiz, Dr. Rivera, and Dr. Cristina Ortiz.

The results of Dr. Winston Ortiz's consultative examination were largely normal but indicated that Rodríguez suffers from certain limitations. Although Rodríguez could bend, stoop, kneel, squat, and walk on his heels and toes, he walked with an antalgic gait. Tr. 679-80. Further, although there was no loss of lumbar lordosis, Rodríguez had limited range of motion in his back and moderately severe lumbar paravertebral muscle spasm. Tr. 680. Based on these and other findings during the examination, Dr. Winston Ortiz opined that Rodríguez could not perform jobs requiring binocular vision, heavy lifting, heavy carrying, walking long distances, prolonged standing, prolonged sitting, or frequent bending. Tr. 680. The ALJ gave this opinion great weight, and it supports her determination that Rodríguez could perform light work with certain exceptions, including a need to sit or stand at will and perform work requiring only monocular vision.

Additionally, Dr. Rivera opined that Rodríguez could lift fifty pounds occasionally and twenty-five pounds frequently; stand, walk, and sit for six hours during an eight-hour workday; push, pull, and balance on an unlimited basis; and frequently climb, stoop, kneel, crouch, and

crawl. Tr. 267-68. And Dr. Cristina Ortiz determined that Rodríguez could occasionally lift twenty pounds and frequently lift ten pounds; stand, walk, and sit for six hours in an eight-hour workday; frequently climb, stoop, kneel, crouch, and crawl; and work only in environments appropriate for monocular vision. Tr. 285-87. The ALJ adopted an RFC that was even more restrictive than either Dr. Rivera or Dr. Cristina Ortiz would require. Their opinions thus offer some support to the ALJ's RFC determination, as they suggest that Rodríguez could perform at least a modified range of light work, if not more.

Rodríguez nonetheless maintains that the RFC determination is faulty because the ALJ should have given greater weight to the opinion of Dr. Román, who stated that, based on Rodríguez's conditions, he was "unfit to work." Tr. 199. According to Rodríguez, the ALJ diminished the importance of this opinion by failing to realize that Dr. Román treated Rodríguez for severe conditions and by wrongly suggesting that most visits to Dr. Román were for prescription refill.

At the outset, I am unconvinced that Dr. Román's statement regarding Rodríguez's fitness to work is properly deemed a treating physician's "medical opinion" under the Commissioner's regulations. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). "[T]he regulations specifically exclude from consideration opinions on certain issues, such as conclusory statements that a claimant is disabled or unable to work." *Dunlap v. Commr. of Soc. Sec.*, 509 Fed. Appx. 472, 476 (6th Cir. 2012) (unpublished) (citing 20 C.F.R. § 404.1527(d)). Thus, where a primary care physician stated that a claimant "has severe low back pain and due to his pain is unable to work," that statement was not properly deemed a "medical opinion" from a treating source. *Id.* at 474, 476. Similarly, here, Dr. Román's attestation that Rodríguez was "unfit to work" offers little insight into Rodríguez's specific functional limitations. It is not, therefore, a medical opinion, and the ALJ

correctly concluded that Dr. Román's statement expressed an opinion on a question reserved for the Commissioner.

But even if Dr. Román's statement were a medical opinion, the ALJ's decision to offer that opinion little weight would nonetheless be supported by substantial evidence. Under the applicable regulations, an ALJ must give controlling weight to a treating source's opinion if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.[3] 20 C.F.R § 404.1527(c)(2). When an ALJ does not assign the opinion controlling weight, she considers various factors, including, among others, the length and nature of the treatment relationship, the supportability of the opinion, and the consistency of the opinion with the record as a whole. 20 C.F.R. § 404.1527(c)(2)-(6). An ALJ need not expressly address each factor identified by the regulations but must provide "good reasons" for the weight assigned to the treating source's opinion. *Bourinot v. Colvin*, 95 F.Supp.3d 161, 177 (D. Mass. 2015); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, Dr. Román's statement that Rodríguez was "unfit to work" is inconsistent with other substantial evidence in the record, including the opinions provided by Dr. Winston Ortiz, Dr. Rivera, and Dr. Cristina Ortiz, all of whom opined that Rodríguez could function at a level sufficient to perform at least modified light work. And the ALJ gave good reasons for offering Dr. Román's statement little weight, explaining that it was not supported by treatment records. Indeed, Dr. Román's treatment records do not document specific functional limitations. Instead, they indicate that Rodríguez sought sought treatment for swelling, redness, lesions, and hypertension; that the treatment he received was conservative; and that there was no evidence of end organ damage except retinopathy without macular edema.[4] Tr. 33.

---

[3] 20 C.F.R. §§ 404.1520c, 416.920c contain new rules regarding the weight given to treating sources that apply to claims filed on March 27, 2017 or later. *See Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018). Because Rodríguez filed his claim on June 1, 2015, the old rules apply.

[4] Although the ALJ noted that Dr. Román's records do not show macular edema, she nonetheless accounted for Rodríguez's retinopathy *with* macular edema as diagnosed by Dr. Winston Ortiz. *See* Tr. 679 (identifying retinopathy with macular edema bilaterally). Tr. 679. Indeed, she offered Dr. Winston Ortiz's opinion great weight and limited Rodríguez to jobs that could be performed with monocular vision. Tr. 33.

Rodríguez also faults the ALJ for stating that the majority of visits to Dr. Román were for prescription refill. But this view fails to account for the language the ALJ used when discussing Dr. Román's treatment records. According to the ALJ, most visits were for prescription refill "[b]esides" those related to ankle swelling and feet numbness. Tr. 33. Although this statement could have been more precise, it correctly conveys that Dr. Román usually treated Rodríguez for swelling and numbness and otherwise generally refilled his prescriptions. *See* Dkt. 19 at 16 (tallying appointments with Dr. Román).

After careful and thorough review of the record, I find no error in the ALJ's treatment of the evidence from Dr. Román and hold that substantial evidence supports the ALJ's RFC determination.

Next, Rodríguez contends that the ALJ's step-five determination is flawed for various reasons. First, Rodríguez argues that the ALJ failed to incorporate Dr. Román's opinion into her hypothetical questions to the VE. This argument essentially rehashes Rodríguez's challenge to the ALJ's RFC determination. For the reasons stated above, the ALJ was not required to adopt Dr. Román's statement that Rodríguez was "unfit to work."

Second, Rodríguez maintains that the ALJ erred because she failed to adopt the limitations Rodríguez's attorney posed in a hypothetical question to the VE. Specifically, the VE testified that a hypothetical person with various limitations could not sustain competitive employment if that person would need to be absent from work at least four times per month. Tr. 70. Rodríguez maintains that the ALJ must at least consider whether Rodríguez has such a limitation. However, Rodríguez points to no portion of the record supporting the conclusion that he must be absent from work four days each month. Rather, he invites this court to surmise that the reason Dr. Román deemed Rodríguez unfit for work was that Dr. Román believed Rodríguez would need to be regularly absent from work. But a claimant's functional limitations may not be based on speculation. Rather, they must be "supported by some medical evidence of the claimant's ability to function in the workplace." *Cox*, 495 F.3d at 619. Here, that evidence is lacking.

Finally, Rodríguez contends that the ALJ's step-five decision is flawed because the ALJ failed to account for Rodríguez's inability to communicate in English. The hearing transcript, however, shows that the ALJ only posed hypothetical questions to the VE involving an individual who could not communicate in English. *See* Tr. 67 ("OK, if you could assume an individual of the claimant's age who is a younger individual and with an 11th grade education and the inability to communicate in English…"); Tr. 68 ("If you could assume the same limitations as in hypo one, except that . . ."). And the ALJ expressly described Rodríguez as being unable to communicate in English in her decision. *See* Tr. 35. Moreover, as the Commissioner explains, effective April 27, 2020, new rules now govern how the Commissioner evaluates the vocational factor of education. *See* SSR 20-01p, 2020 WL 1285114, at *2. Now, a claimant is only "illiterate" if he or she "is unable to read or write a simple message in any language." *Id.* at *3; *see also id.* at *3 n.8 ("We no longer have an education category of 'inability to communicate in English' as of April 27, 2020."). Because Rodríguez completed the 11th grade, he would no longer be deemed "illiterate" under the Commissioner's rules, whether or not he could communicate in English. *See id.* at *2 ("Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."). Thus, remand would "amount to no more than an empty exercise." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 656 (1st Cir. 2000). For these reasons, I find that the ALJ did not err in accounting for Rodríguez's inability to communicate in English at step five.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence. *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987). After thoroughly and carefully reviewing the record, I find that the errors raised by the claimant were either harmless or meritless, and that there is substantial evidence to support the ALJ's RFC finding. The decision is therefore affirmed.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of May, 2021.

                                              **S/Bruce J. McGiverin**
                                              BRUCE J. MCGIVERIN
                                              United States Magistrate Judge